UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Mukendi Mbiya

    v.

John Doe, et al.

Civil No. 1:26-cv-00467-JL-TSM
Opinion No. 2026 DNH 094

**MEMORANDUM ORDER**

This habeas case concerns the Department of Homeland Security's denial of bond to a noncitizen detained under 8 U.S.C. § 1226(a), based on a dangerousness finding that rests on the noncitizen's involvement in fatal but unavoidable pedestrian accident. Petitioner Mukendi Mbiya, an Angolan national detained at FCI Berlin, contends that neither of the two bond hearings he has received in immigration detention have comported with due process because the Immigration Judges failed to hold the government to its burden of proving that he posed a danger to the community or an unmanageable risk of flight. Both dangerousness determinations were based solely on a fatal pedestrian accident for which the uncontested evidence attributed no contributing conduct to Mbiya; the later flight-risk determination also rested on a non-final order of removal.

This court has jurisdiction under 28 U.S.C. §§ 1331 and 2241, and the circumstances warrant excusing administrative exhaustion. Because the Immigration Judges failed to apply the constitutionally required burden of proof in finding Mbiya dangerous and because the evidence was insufficient as a matter of law to establish either dangerousness

or a flight risk that no amount of bond or conditions of release could ameliorate, the petition is granted.

## I.    Background

Mbiya is an Angolan national who entered the United States as a tourist in 2018.[1] His wife and three oldest children joined him shortly thereafter.[2] Before his tourist visa expired, Mbiya applied for asylum and, from 2018 to 2025, lived with his family in Maine while his application remained pending.[3] During that time, Mbiya obtained work authorization, secured employment as a Purchase Specialist at Abbott Laboratories, bought and owned a home in Maine, and welcomed three additional children with his wife, all of whom are U.S. citizens by birth.[4]

On the evening of August 16, 2025, Mbiya was driving home from North Deering Alliance Church when he struck and fatally injured a pedestrian.[5] Two passengers were traveling with Mbiya at the time, both of whom report that the pedestrian ran into the roadway in a "particularly dark" area and that Mbiya swerved to avoid her but was unable to do so.[6] The Maine State Police responded to the scene and completed a crash report, which provides that Mbiya's condition was "normal" (i.e., he did not appear to be under the influence of drugs or alcohol), that he took "no contributing action" to the accident, and

---

[1] Pet. (doc. no. 1) ¶ 19.
[2] Id.
[3] Id. ¶¶ 20-21.
[4] Id. ¶ 21.
[5] Id. ¶ 23; State of Maine Crash Report (doc. no. 1-2).
[6] State of Maine Crash Report (doc. no. 1-2); Aug. 22, 2025 Witness Statement (doc. no. 1-5).

that the pedestrian was "not visible" because of dark clothing or low light.[7]  The report also notes that there was no traffic signal or crosswalk where the pedestrian attempted to cross.[8]  Police neither arrested Mbiya nor took any action against his driver's license, which was active and presented to responding officers.[9]  Three days later, ICE arrested Mbiya at his home and took him into immigration custody.[10]

To date, state authorities have not taken any action against Mbiya in connection with the accident, and the record contains no suggestion of civil litigation or insurance-funded recovery involving the decedent or her estate.  In short, there is no evidence before this court indicating that Mbiya has in any way been held liable or deemed culpable for the fatality.

### A.  First bond hearing[11]

On August 28, 2025, an Immigration Judge held a custody determination hearing under 28 U.S.C. § 1226(a).  In advance of the hearing, Mbiya submitted the State of Maine's crash report, signed witness statements from his two passengers at the time of the accident, and letters of support from his pastor and sponsor.[12]  DHS, in turn, filed Mbiya's

---

[7] State of Maine Crash Report (doc. no. 1-2).

[8] *Id.*

[9] *See id.*

[10] Pet. (doc. no. 1) ¶ 25.

[11] The facts recited in this section are drawn from the audio recording of the August 28, 2025 bond hearing unless otherwise indicated.

[12] *See* List of Supporting Documents (doc. no. 1-5).

Form I-213, which describes his criminal history as follows: "Record checks show MBIYA

has no criminal history in the United States."[13]

At the hearing, DHS argued that bond should be denied based on flight risk and

dangerousness.   DHS rested its flight risk contention on the "speculative" nature of

Mbiya's then-pending asylum claim.   As to dangerousness, DHS stated that Mbiya "fatally

hit a pedestrian with his car recently."   Counsel for DHS then added:

> I would be remiss not to mention that, based on the [crash]
> report, [Mbiya] was not intoxicated, nor did he flee the scene,
> [and] based on a witness statement, the victim ran out into
> traffic.   I would note, I believe it was 8:30 p.m. at night at the
> time of the accident.

DHS concluded by reiterating its position that Mbiya was dangerous "based on the

recent car accident, even though there have been no criminal charges lodged."

Mbiya's counsel responded by arguing that the accident, while tragic, was caused

by the pedestrian stepping out in front of Mbiya's vehicle.   He supported his position by

pointing to the state's crash report, which he argued "confirms that [Mbiya] has no

responsibility in the accident."    Mbiya's counsel also discussed the strength of his

community ties, including that was financially supporting his large family in Maine

through lawful employment.

After hearing the parties' arguments, the Immigration Judge issued an oral ruling:

> The court does find that [Mbiya] is a danger to the community
> by clear and convincing evidence based on the recent fatality
> in the motor vehicle accident.   The court understands that it

---

[13] Form I-213 (doc. no. 1-7) at 3.

4

was likely an accident and not intentional based on the evidence before the court, and there's not an indication of driving under the influence, nevertheless, the court notes the serious nature of it.  Someone was killed.  And the court also notes the recency – August 16, 2025.  Pedestrian was crossing the street.  [Mbiya] does have a responsibility behind the wheel of the car to look out for pedestrians.  And the court is denying bond finding danger to the community.

The Immigration Judge made no reference to which party carried the burden of proof.  In the short written order that followed, the Immigration Judge states that bond was denied because "[Mbiya] is a danger to the community."[14]

## B. Second bond hearing[15]

On February 3, 2026, an Immigration Judge held a second custody determination hearing under 28 U.S.C. § 1226(a) based on a change in Mbiya's circumstances—namely, that an Immigration Judge had ordered Mbiya removed.  In advance of the hearing, Mbiya filed a letter from his wife, birth certificates for his three U.S. citizen children, the purchase and sale agreement for his home in Maine, letters from friends and his employer, his Form I-213, and his criminal history record in the State of Maine, which shows no charges.[16] DHS submitted only Mbiya's I-213.[17]

At the hearing, DHS again asserted that Mbiya was dangerousness based on the fatal car accident.  Counsel for DHS encouraged the Immigration Judge to adopt the finding

---

[14] Aug. 29, 2025 Order of the Immigration Judge (doc. no. 1-6).
[15] The facts recited in this section are drawn from the audio recording of the February 3, 2026 bond hearing unless otherwise indicated.
[16] *See* List of Exhibits: Request for Custody Redetermination (doc. no. 1-7).
[17] Pet. (doc. no. 1) ¶ 34.

from Mbiya's first bond hearing, arguing: "Because [Mbiya] came here and he overstayed and he was involved in an accident that resulted in death, I think that's part of the reason the [Immigration Judge] found him to be a danger [at the August 28 hearing]… Nothing [has] changed about those facts since then."  DHS also contended that Mbiya was a flight risk because he was now under an order of removal.  Mbiya's counsel countered by arguing that Mbiya was fighting the denial of his asylum claim on appeal to the BIA with new counsel and had no incentive to abscond given his role supporting his large family.  As to dangerousness, Mbiya's counsel again emphasized that Maine authorities had declined to charge Mbiya or take any action against his license in connection with the accident and his clean criminal record.

After hearing the parties' arguments, the Immigration Judge denied bond based on dangerousness and flight risk.  As to dangerousness, the Immigration Judge ruled that

> considering the totality of the circumstances, the court is finding that there should still remain no change in [Mbiya's] custody status.  The court considers the evidence that it has before it.  The court understands that there have not been charges brought against [Mbiya] but the court cannot diminish that he was the operator of a motor vehicle that ultimately killed an individual.  So the court is maintaining, by clear and convincing evidence, that the danger is present.

As to flight risk, the Immigration Judge ruled "that [Mbiya] has presented a flight risk that there would not be an amount of bond or conditions that could ameliorate" based on "the prior instance resulting in the death of an individual" and that he was "now has a removal order."  She explained that her ruling was based on a weighing of these two factors

6

against Mbiya's length of residence in the United States, his positive letters of support, his sponsorship documents, his pending appeal before the BIA, his employment verification, and "his family."

Again, the Immigration Judge made no reference to which party carried the burden of proof. In the short written order that followed, the Immigration Judge states that Mbiya "is a danger to the community" and "poses a flight risk and there is no bond amount or condition of bond that would assure the court of [his] participation in the proceedings."[18]

## II.    Analysis

Mbiya now petitions this court for a writ of habeas corpus, asserting that neither bond hearing comported with due process requirements because the Immigration Judges failed to apply the proper standard of proof and hold DHS to its burden of showing either dangerousness by clear and convincing evidence or flight risk by a preponderance of evidence, as required by *Hernandez-Lara v. Lyons*, 10 F.4th 19, 41 (1st Cir. 2021). As to relief, Mbiya seeks immediate release. The government filed an objection to the petition, arguing that it should be denied both on the merits and on jurisdictional and exhaustion grounds.

### C. Jurisdiction

This court may grant a writ of habeas corpus to a person held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

---

[18] Feb. 3, 2026 Order of the Immigration Judge (doc. no. 1-8).

Although 8 U.S.C. § 1226(e) provides that "[n]o court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole," the respondents concede that this court may review an Immigration Judge's decision to deny bond to determine "whether the petitioner received the constitutional due process to which he was entitled." *Massingue v. Streeter,* 2020 WL 1866255, at *4 (D. Mass. Apr. 14, 2020).[19]

Here, Mbiya challenges the constitutional sufficiency of his two bond hearings, asserting that, in both instances, the IJ failed to apply the appropriate burdens of proof, failed to make findings rooted in evidence, and gave no justification for her decisions. Based on the respondents' concession, and as it did previously in *Makuraza v. Wesling, et al.,* 2026 WL 1068066 (D.N.H. Apr. 20, 20216), this court joins others in finding that "[a]lthough the court may not review the Immigration Judge's discretionary judgment, the Immigration Judge does not have discretion to fail to apply the burden of proof that due process requires." *See Mayancela Mayancela v. FCI Berlin,* 2025 WL 3215638, at *5 (D.N.H. Nov. 18, 2025) (McCafferty, J.); *see also Massingue,* 2020 WL 1866255, at *4; *Dos Reis v. Vitello,* 2025 WL 1043434, at *2 (D. Mass. Apr. 8, 2025).

### D. Administrative exhaustion

"There are two species of exhaustion: statutory and common-law. The former deprives a federal court of jurisdiction, while the latter 'cedes discretion to a [federal] court

---

[19] Response to Pet. (doc. no. 7) at 8.

to decline the exercise of jurisdiction.'" *Brito v. Garland*, 22 F.4th 240, 255 (1st Cir. 2021) (quoting *Anversa v. Partners Healthcare Sys., Inc*., 835 F.3d 167, 174-76 (1st Cir. 2016)). Since no statute requires exhaustion, "sound judicial discretion governs." *Morgan v. Garland,* 120 F.4th 913, 927 (1st Cir. 2024) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992)).  In making the decision, the court "must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *Anversa*, 835 F.3d at 176 (quoting *McCarthy*, 503 U.S. at 146).  "[I]f the situation is such that 'a particular plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his claim,' exhaustion may be excused even though 'the administrative decisionmaking schedule is otherwise reasonable and definite.'"  *Portela-Gonzalez v. Sec'y of the Navy*, 109 F.3d 74, 77 (1st Cir. 1997) (citing *McCarthy v. Madigan*, 503 U.S. 140, 147 (1992)).

The particular facts and circumstances of Mbiya's case warrant waiver of exhaustion under that standard.  Mbiya is suffering irreparable harm in the form of loss of liberty while detained.  *Brito*, 22 F.4th at 256 ("[E]xhaustion might not be required if [the petitioner] were challenging her incarceration ... or the ongoing deprivation of some other liberty interest." (quoting *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986))).  Considering the potential length of detention for an appeal of the Immigration Judge's flight risk and dangerousness finding, the court finds that Mbiya is not required to exhaust his administrative remedies under the facts and circumstances of this case.

## E. Constitutional sufficiency of bond hearings

Although this court has authority to consider Mbiya's claim, that authority is "limited." *Mayancela Mayancela,* 2025 WL 3215638, at *5 (quoting *Diaz Ortiz v. Smith,* 384 F. Supp. 3d 140, 143 (D. Mass. 2019)). "To obtain habeas relief, a petitioner must show that the Immigration Judge failed to place the burden of proof on the government" as required by *Hernandez-Lara.* *Diaz Ortiz,* 384 F.Supp.3d at 143; *see Hernandez-Lara,* 10 F.4th at 41. To make this showing, a noncitizen "must either 'point to the language of the immigration judge's opinion or demonstrate that 'the evidence itself could not—as a matter of law—have supported' the immigration judge's decision to deny bond." *Nucamendiz v. Hyde,* 2026 WL 221449, at *2 (D. Mass. Jan. 28, 2026) (quoting *Diaz Ortiz,* 384 F. Supp. 3d at 143). Here, Mbiya attacks the constitutionality of his bond hearings from both angles, challenging the sufficiency of Immigration Judges' reasoning and the sufficiency of the evidence as a matter of law.

To deny bond, "DHS must prove by clear and convincing evidence that the [noncitizen] poses a danger to the community or prove by a preponderance of the evidence that the respondent poses a flight risk." *Mayancela,* 2025 WL 3215638, at *5 (citing *Hernandez-Lara,* 10 F.4th at 41). In making such a finding, the Immigration Judge "generally must sufficiently explain [his or her] reasoning to permit appellate or judicial review of their decisions." *Id.* at *6 (citing *Barnica-Lopez v. Garland,* 59 F.4th 520, 530 (1st Cir. 2023)). While this does not require an Immigration Judge to "discuss ad nauseam every piece of evidence," the Immigration Judge must "must "give[ ] reasoned

10

consideration to the evidence as a whole, ma[k]e supportable findings, and adequately explain[ ] its reasoning." *Barnica-Lopez*, 59 F.4th at 530 (quoting *Pan v. Gonzales*, 489 F.3d 80, 87 (1st Cir. 2007)). Thus, while the Immigration Judge "need not spell out every last detail of its reasoning where the logical underpinnings are clear from the record, it is obligated to offer more explanation when the record suggests strong arguments for the petitioner that [DHS] has not considered." *Rivera-Medrano v. Garland*, 47 F.4th 29, 39 (1st Cir. 2022).

***Dangerousness: language of decision.*** Looking first to the language of the Immigration Judge's dangerousness ruling at Mbiya's initial bond hearing, the court agrees with Mbiya that it reveals a failure to apply the "clear and convincing" standard to the evidence before the court. To start, although the Immigration Judge recited the words "clear and convincing evidence" in announcing her dangerousness finding, she never stated that DHS bore that burden. Nor does the brief written order that followed mention the governing standard; it states only that bond was denied because "[Mbiya] is a danger to the community." *Contrast with Diaz Ortiz*, 384 F.Supp.3d at 142 (observing that IJ's opinion demonstrated a proper allocation of proof because IJ "explained that the Government bore the burden of proof, and stated his conclusion that the Government had met its burden"). The Immigration Judge also did not "point[] out factors typically significant in determining dangerousness and flight risk, such as the person's ties to the community, employment history, criminal records, and any history of flight from law enforcement or past failures to appear for court proceedings." *Mayancela*, 2025 WL 3215638, at *6. Indeed, at the first

11

bond hearing, the Immigration Judge did not mention Mbiya's lack of any criminal history, his employment, or his substantial ties to his family and community in Maine.

More significantly, the Immigration Judge failed to grapple with the most probative evidence concerning the sole basis for DHS's claim of dangerousness. Although she acknowledged that the fatality was "likely an accident and not intentional" and that there was no indication Mbiya was "driving under the influence," she never addressed the state police crash report's uncontested findings concerning Mbiya's role in the accident. As DHS preemptively conceded during its argument on dangerousness, that report states that Mbiya's condition was "normal," that he took "no contributing action" to the accident, and that the pedestrian was "not visible" because of dark clothing or low light.[20] The Immigration Judge likewise did not address the consistent accounts of Mbiya's two passengers, both of whom stated that the pedestrian ran into the roadway in a "particularly dark" area and that Mbiya swerved in an unsuccessful attempt to avoid her.[21] The absence of any reference to this uncontested testimonial and documentary evidence, even after the government acknowledged its exculpatory character, suggests that the Immigration Judge may have "simply ignore[d] substantial testimonial and documentary proof" bearing directly on whether the accident demonstrated that Mbiya posed a danger to the community. *Barnica-Lopez,* 59 F.4th at 530 (quoting *Pan,* 489 F.3d at 87).

---

[20] State of Maine Crash Report (doc. no. 1-2).
[21] Aug. 22, 2025 Witness Statement (doc. no. 1-5).

That concern is reinforced by the reasons the Immigration Judge gave for finding dangerousness.  Her primary explanation was that the "pedestrian was crossing the street" and that "[Mbiya] [] ha[s] a responsibility behind the wheel of the car to look out for pedestrians."  But the apparent logical underpinning of that reasoning—namely, that Mbiya failed to fulfill his responsibility to look out for pedestrians—is difficult to reconcile with the uncontested evidence that the pedestrian was "not visible," ran into the roadway in a "particularly dark" area, and could not be avoided despite Mbiya's attempt to swerve around her.  The same is true of the Immigration Judge's only other stated justification: the "recency" of the accident.  The apparent significance of recency would be that the circumstances remained unresolved or that additional information bearing on Mbiya's culpability might emerge.  But the Immigration Judge did not identify any such uncertainty. The record contained the crash report and witness statements describing the collision, and nothing in that evidence suggested that Mbiya had been charged with an offense, had lost the driving privileges granted to him by the State of Maine, or was the subject of any other adverse action arising from the accident.  Without some explanation connecting the accident's recency to a present likelihood that Mbiya's release would endanger the community, the logical underpinning of the Immigration Judge's reliance on that factor cannot be discerned from the record.

In short "[t]he [Immigration Judge] failed to demonstrate reasoned consideration of this crucial exculpatory evidence, and the underpinnings by which she discounted it cannot be inferred from her reasoning on the record or the materials submitted at the hearing."

13

*Timbigamba v. FCI Berlin*, 2026 WL 1470320, at *8 (D.N.H. May 26, 2026). Thus, this appears to be the rare circumstance in which it is "clear from the [Immigration Judge's] opinion itself that [she] simply did not apply the correct standard to the facts" in reaching her dangerousness finding at Mbiya's initial bond hearing. *Massingue*, 2020 WL 1866255, at *4 (quoting *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 240 (W.D.N.Y. 2019)).

The same deficiencies carried forward to Mbiya's second bond hearing. The second Immigration Judge likewise did not acknowledge (either in her oral ruling or the short written order that followed) that DHS bore the burden of establishing dangerousness by clear and convincing evidence or explain how the evidence satisfied that demanding standard. Instead, she reasoned that, although "there have not been charges brought against [Mbiya]," the court "cannot diminish that he was the operator of a motor vehicle that ultimately killed an individual." That reasoning again focused exclusively on the tragic result of the accident while failing to address the uncontested evidence concerning Mbiya's conduct: the state police found that he took "no contributing action" to the collision and that the pedestrian was "not visible." Nor did the second Immigration Judge identify any evidence contradicting those findings or otherwise explain why an accident for which the record attributed no fault to Mbiya demonstrated that he posed a present danger to the community. Her dangerousness determination therefore suffers from the same fundamental flaw as the first: it does not reflect reasoned consideration of the evidence bearing directly on the only event DHS invoked to carry its burden.

14

***Dangerousness: sufficiency of evidence.***  The court also agrees with Mbiya that DHS's evidence was insufficient as a matter of law to prove, by clear and convincing evidence, that he posed a danger to the community.  The clear and convincing standard "is a demanding standard to satisfy."  *United States v. Anonymous Appellant*, 85 F.4th 576, 580 (1st Cir. 2023).  "Clear and convincing evidence means highly probable, or reasonably certain," and "falls between preponderance of the evidence and proof beyond a reasonable doubt."  *Diaz-Alarcon v. Flandez-Marcel*, 944 F.3d 303, 306 (1st Cir. 2019) (internal citations omitted).

Here, even construing the evidence in the light most favorable to the Immigration Judge's decision, the court finds that the evidence available to the Immigration Judge was insufficient as a matter of law to establish that Mbiya's release posed a danger to the community to a high degree of probability or reasonable certainty.  At both hearings, DHS's attempt to carry its burden rested entirely on the pedestrian fatality.  In neither, however, did DHS identify a single action Mbiya took that caused or contributed to the accident, nor any action he could have taken to avoid it.  To the contrary, as discussed above, the only evidence addressing those questions pointed in the opposite direction.  Again, the crash report found that Mbiya took "no contributing action" to the accident and that the pedestrian was "not visible."  His two passengers likewise stated that the pedestrian ran into the roadway in a "particularly dark" area and that Mbiya swerved in an unsuccessful attempt to avoid her.  There was no evidence that Mbiya was intoxicated, speeding, distracted, driving without a valid license, or otherwise operating his vehicle

15

unlawfully or negligently. And, as of the second bond hearing more than six months later, Maine authorities had neither charged Mbiya with an offense nor taken any action against his driver's license. In short, for both hearings, the record before the Immigration Judge contained no evidence presented by DHS or anyone else—no police report, accident reconstruction report, criminal charge, administrative license suspicion, civil suit, civil settlement or insurance payment—even suggesting that Mbiya bore any responsibility for the unfortunate incident.

DHS's theory of dangerousness ultimately reduced to a theory of but-for causation: "[b]ecause [Mbiya] came here and he overstayed, he was involved in an accident that resulted in death," and should be found dangerous. But this contention fails to take into account that Mbiya was an asylum applicant with work authorization driving under a valid Maine license when the accident occurred. The court cannot conclude that a person poses a danger to the community, much less that he does so to a high degree of probability or reasonable certainty, merely because an apparently unavoidable accident occurred while he was lawfully exercising a driving privilege granted to him by the State of Maine. Simply put, the tragic consequence of an event does not, without evidence of culpable conduct or some other basis to infer a risk of future harm, establish (or even suggest) that the person involved in that event is a danger to the community.

Accordingly, the court agrees with Mbiya that the Immigration Judge twice failed to hold DHS to its burden of proving, by "clear and convincing" evidence, that he presents a danger to the community. The language of both Immigration Judges' rulings

16

demonstrates a failure to apply the governing burden to the evidence before them, and, independently, the record could not as a matter of law support a finding by clear and convincing evidence that Mbiya posed a danger to the community.

*Flight risk: language of decision.*  Mbiya also challenges the flight-risk finding made at his second bond hearing.  Pointing to the language of the Immigration Judge's ruling, Mbiya asserts that the Immigration Judge necessarily failed to apply the correct burden of proof because she did not sufficiently explain her conclusion.

The court is unpersuaded.  Unlike with respect to dangerousness, "the logical underpinnings of the IJ's reasoning are clear from her [oral] decision." *Mayancela*, 2025 WL 3215638, at *6.  The Immigration Judge placed significant weight on two facts: the pedestrian fatality and the entry of a removal order against Mbiya.  She also expressly stated that she had considered the evidence submitted by Mbiya, which she specifically summarized as including his length of residence in the United States, his positive letters of support, his sponsorship documents, his pending appeal before the BIA, his employment verification, and "his family."  After reciting that evidence, the Immigration Judge reached her determination "based on the totality of circumstances."  Thus, the Immigration Judge's oral ruling is not so devoid of reasoning that it is "clear from the [Immigration Judge's] opinion itself that [she] simply did not apply the correct standard to the facts." *Massingue*, 2020 WL 1866255, at *4 (quoting *Hechavarria*, 358 F. Supp. 3d at 240).

*Flight risk: sufficiency evidence.*  The court agrees with Mbiya, however, that the evidence was insufficient as a matter of law to establish that he posed a flight risk that no

17

amount of bond or conditions of release could ameliorate.  To start, the pedestrian fatality does not meaningfully support an inference that Mbiya is likely to flee.  After all, Mbiya apparently remained at the scene of the accident and cooperated with responding officers. He did not attempt to evade law enforcement in the immediate aftermath of the accident, when any incentive to flee based on the possibility of criminal charges would have been at its greatest.  And, by the time of the second bond hearing more than six months later, no criminal charges or civil claims had been filed and no action had been taken against Mbiya's driver's license.  Such circumstances tend to diminish rather than strengthen any inference that the accident creates a present incentive to abscond.

That leaves the non-final order of removal as the only factor identified by the IJ that affirmatively supports a risk of flight.  An order of removal is undoubtedly relevant to the flight-risk assessment.  *See, e.g., Lokombe v. Wesling*, 2026 WL 1270814, at \*3 (D.N.H. May 8, 2026) (rejecting challenge to sufficiency of flight-risk evidence where IJ based finding on noncitizen's short length of residence in the United States, immigration history, and that he was "under a (not yet final) order of removal").  But "the INA specifically provides that the existence of an order of removal compels denial of bond only once that order becomes 'administratively final.'" *Timbigamba*, 2026 WL 1470320, at \*10 (citing 8 U.S.C. §§ 1231(a)(1)(B)(i), (2)(A); 8 C.F.R. § 1241.1 (specifying circumstances in which "[a]n order of removal made by the [IJ] at the conclusion of proceedings under [8 U.S.C. § 1229a] shall become final")). Thus, while the entry of a removal order may increase a noncitizen's incentive to flee and properly bear on an individualized custody

18

determination, it only one factor in the overall flight-risk analysis, and must be evaluated together with the noncitizen's individual circumstances, including

> (1) [W]hether the alien has a fixed address in the United States; (2) the alien's length of residence in the United States; (3) the alien's family ties in the United States, and whether they may entitle the alien to reside permanently in the United States in the future; (4) the alien's employment history; (5) the alien's record of appearance in court; (6) the alien's criminal record, including the extensiveness of criminal activity, the recency of such activity, and the seriousness of the offenses; (7) the alien's history of immigration violations; (8) any attempts by the alien to flee prosecution or otherwise escape from authorities; and (9) the alien's manner of entry to the United States.

*In Re Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006).

Here, apart from the non-final removal order, the evidence before the Immigration Judge uniformly weighed against a finding that Mbiya was likely to flee.  Mbiya had lived in the United States for approximately eight years, owned a home in Maine, maintained lawful employment, and financially supported his wife and six children, three of whom are U.S. citizens.  He submitted positive letters from his employer and members of his community and was actively pursuing his appeal before the BIA through new counsel. There was no evidence of any prior attempt to evade immigration or other law enforcement, any failure to appear for a court proceeding, or any violation of a condition of release.  Nor did DHS identify any other conduct suggesting that Mbiya would abandon his family, employment, home, and pending appeal rather than continue to litigate his claim for relief through the administrative process.  On this record, the non-final removal order, standing effectively alone, was insufficient as a matter of law to establish by a preponderance of the

19

evidence that Mbiya posed a flight risk for which "there would not be an amount of bond or conditions that could ameliorate."

### F. **Remedy**

As to remedy, Mbiya, who has now been detained for nearly a year, requests immediate release.[22]  The respondents' objection takes no position on the question of remedy should the court find a due process violation.[23]

Ordinarily, the appropriate remedy for a due process violation of this kind is a new bond hearing at which the correct burden is properly applied.  *See Hernandez-Lara*, 10 F.4th at 42.  But that remedy is not automatic: "when the judicial power to issue habeas corpus properly is invoked the judicial officer must have adequate authority ... to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release."  *Boumediene v. Bush*, 553 U.S. 723, 779 (2008).  Accordingly, courts have ordered immediate release in ICE habeas cases where a further bond hearing would serve no purpose.  *See, e.g.*, *Timbigamba*, 2026 WL 1470320, at *12 (ordering immediate release where record before the court established, as a matter of law, that noncitizen was neither a danger to the community nor a flight risk).

Such is the case here.  DHS has now had two opportunities at hearings held nearly six months apart to come forward with evidence establishing that Mbiya poses a danger to the community or a flight risk.  At both hearings, DHS's dangerousness argument rested

---

[22] Pet. (doc. no. 1) ¶ 5.
[23] *See* Response to Pet. (doc. no. 7).

entirely on the same event: the August 16, 2025 accident.  And at both hearings, DHS failed, as a matter of law, to identify any evidence that Mbiya acted culpably or dangerously in connection with that accident or that his release would pose a present danger to the community.  As discussed above, the uncontested record (the state crash report, the passengers' witness statements, and the ongoing absence of any citation, charge, or license action) has remained constant in cutting against, if not precluding, a finding of dangerousness based on that event.  DHS has not suggested, either below or before this court, that any additional evidence exists or could be developed that would alter this record.  Similarly, as to flight risk, DHS has not suggested it could supplement its evidence of flight risk, which was limited at the second hearing to the entry of a non-final removal order, and considered against a record of eight years' residence, home ownership, lawful employment, an intact family with three U.S.-citizen children, and no history of absconding or violating release conditions.

Given this posture, a third bond hearing would not cure the constitutional deficiencies already identified and would likely result in a third weighing of the same insufficient evidence.  DHS has had two full and fair opportunities to meet its burden and has twice failed to do so as a matter of law, without identifying any prospect of additional proof.  Under these specific circumstances, remanding for yet another bond hearing would be futile and would prolong Mbiya's unconstitutional detention.  Accordingly, the court concludes that immediate release, rather than a further bond hearing, is the proper remedy.

21

**III.    Conclusion**

For the reasons stated, Mbiya's petition for a writ of habeas corpus is **GRANTED**. The respondents are ordered to release Mbiya under reasonable conditions of supervision **on or before July 23, 2026**. The respondents shall file a status report confirming their compliance with this order within forty-eight (48) hours of Mbiya's release.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: July 21, 2026

cc:    Counsel of Record

22